**HAITIAN REFUGEE CENTER, INC., et al., Plaintiffs–Appellees,**

**v.**

**James BAKER, III, Secretary of State, Robert Kramek, Rear Admiral, Kime, Admiral, Commandant, United States Coast Guard, Gene McNary, Commissioner, Immigration and Naturalization Service, United States Department of Justice, Immigration and Naturalization Service, United States of America, Defendants–Appellants.**

No. 91–6060.

United States Court of Appeals, Eleventh Circuit.

Rehearing and Rehearing En Banc Denied Jan. 28, 1992.

Dec. 17, 1991.

John F. Daly, Michael Jay Singer, Edward T. Swaine, Kenneth W. Starr, Washington, D.C., for defendants-appellants.

Ira Kurzban, Kurzban, Kurzban & Weinger, Miami, Fla., for plaintiffs-appellees.

Before TJOFLAT, Chief Judge, HATCHETT and COX, Circuit Judges.

PER CURIAM:

On December 3, 1991, the district court issued a preliminary injunction prohibiting the defendants, James Baker, III, and others from forcefully repatriating Haitians in their custody. The defendants appeal. The appeal has been expedited and is now ripe for decision on the merits.

The district court's order granting the preliminary injunction was grounded on a finding that there was a substantial likelihood that the plaintiffs would prevail on the merits of two judicially enforceable claims: (1) "HRC's right of association and counsel, which arises from the First Amendment to the United States Constitution;" and (2) "the Haitian plaintiffs' right of nonrefoulment, which arises under Article 33 of the 1967 United Nations Protocol Relating to the Status of Refugees."

■ Ordinarily, the grant of a preliminary injunction is reviewed for abuse of discretion; however, if the trial court misapplies the law we will review and correct the error without deference to that court's determination. *Cable News Network, Inc. v. Video Monitoring Servs., Inc.*, 940 F.2d 1471, 1477 (11th Cir.1991).

In order to prevail on a motion for preliminary injunction, the movant has the burden of proving: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) its own injury outweighs the injury to the nonmovant; and (4) the injunction would not disserve the public interest. *Id.* at 1478, *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1990).

■ Defendants argue that the Haitian plaintiffs in this case have no enforceable rights under Article 33 because Article 33 is not self-executing as to persons situated like the plaintiffs in this case. The individual Haitians who are plaintiffs in this case have not reached United States territory.

■ The language of the Protocol and the history of the United States' accession to it leads to the conclusion that Article 33 is not self-executing and thus provides no enforceable rights to the Haitian plaintiffs in this case. (A "self-executing" international agreement is one that directly accords enforceable rights to persons without the benefit of Congressional implementation.) *See Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C.Cir.1987) (Edwards, J. concurring in part and dissenting in part); *Bertrand v. Sava*, 684 F.2d 204 (2nd Cir.1982); *Pierre v. United States*, 547 F.2d 1281 (5th Cir.1977), *vacated on other grounds*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977).

■ Next, the defendants argue that even if the plaintiffs had a First Amendment right of access to the interdicted Haitians, the relief granted by the injunction is unrelated to the right asserted by HRC. The district court's injunction order states as follows:

> [D]efendants are hereby enjoined from forcefully repatriating the individual plaintiffs or class members in their custody either until the merits of the under-

lying action are resolved or until defendants implement and follow procedures, such as those contained in the INS Guidelines, adequate to ensure that Haitians with bona fide political asylum claims are not forced to return to Haiti in violation of Article 33 of the Protocol. To this end, within seven days defendants shall submit to the court a recital of the procedures to be followed.

The district court's order is not merely overly broad, *see United States v. Gilbert*, 920 F.2d 878 (11th Cir.1991), it fails to redress the right asserted by HRC. Here, HRC asserts a right of access to the interdicted Haitians. The injunctive relief granted by the district court does not require the defendants to allow HRC access to the Haitian interdictees, it enjoins the defendants from repatriating them. Because the relief granted does not address the right of access asserted by HRC, the First Amendment claim cannot support the injunction.

■ Judge Hatchett, in dissent, would uphold the issuance of the preliminary injunction on the basis of the APA claim. The district court refused to grant relief on this claim. The plaintiffs do not cross-appeal. We cannot properly uphold the injunction based on the APA claim under these circumstances. Furthermore, to do so would constitute a holding by this court, on appeal, that the plaintiffs are entitled to injunctive relief on the APA claim as a matter of law.

For the foregoing reasons, the preliminary injunction issued by the district court is hereby DISSOLVED and the case is REMANDED to the district court with instructions to dismiss, on the merits, the claims predicated on Article 33.

The mandate shall issue immediately and no petition for panel rehearing will be entertained.[1]

HATCHETT, Circuit Judge, dissenting:

I respectfully dissent. The district court properly issued the preliminary injunction

in this case. Additionally, I dissent from the majority's decision that although this court has jurisdiction over this case, the scope of our jurisdiction is not broad enough to afford review of the district court's refusal to grant the preliminary injunction on the Administrative Procedures Act (APA) claim.

## A. FACTUAL MATTERS

It is important to put this case in proper context through consideration of factual matters borne out by the record.

1. Under existing law, any refugee may reach the shores of the United States and thereby acquire the right to enforce United States immigration laws in United States courts, except Haitian refugees. Only Haitian refugees are intercepted in international waters and repatriated to their country of origin. This activity is conducted under an agreement between the Reagan administration and the totalitarian Haitian government in place in 1981, the regime of Jean-Claude Duvalier.

2. The government asserts that prior to the district court's entry of the preliminary injunction, it fairly and adequately applied United States immigration laws to the refugees' claims of political asylum. The district court's preliminary injunction provides that the government refrain from repatriating Haitian refugees until the court has determined the merits of this case or until the government submits a plan outlining its screening procedures.[1] Consequently, the district court has ordered the government to do no more than the government maintains it was already doing. Thus, the order does not harm the government at all, and certainly imposes no "irreparable harm." The balance of harms in this case tips decidedly in favor of the Haitian refugees, who face injury or death if wrongfully repatriated.

3. A simple reading of the district court's preliminary injunction belies the government's argument that the district court has barred it from returning these

---

1. This brief opinion is filed in order to expedite disposition of the appeal. No supplemental opinion will be filed.

1. The government has not submitted such a plan.

refugees to Haiti. At most, the preliminary injunction *delays* the return of refugees not entitled to political asylum in the United States. Nothing in the preliminary injunction can lead one to conclude that these refugees must either be brought to the United States or carried to Guantanamo Bay, Cuba, to be held indefinitely.

4. The government seeks to convince this court that its interdiction program was instituted as an effort to save the lives of Haitian refugees traveling in unseaworthy vessels. But the government's own brief shows that the program was instituted in 1981, long before the current immigration wave, for the express purpose of more efficiently enforcing United States immigration law. The primary purpose of the program was, and has continued to be, to keep Haitians out of the United States.

5. At the bottom of this case is the government's decision to intercept Haitian refugees on the high seas, in international waters, to prevent them from reaching United States territory. If these refugees reach United States territory, they will have the right to insist, in United States courts, that they be accorded proper, fair, and adequate screening procedures.[2] In addition, they will receive counseling from the Haitian Refugee Center (HRC) and volunteer lawyers who will ensure the proper application of United States immigration laws. The interdiction program is a clear effort by the government to circumvent this result.

The United Nations Protocol on Refugees, and the United States immigration laws which execute it, were motivated by the World War II refugee experience. Jewish refugees seeking to escape the horror of Nazi Germany sat on ships in New York Harbor, only to be rebuffed and returned to Nazi Germany gas chambers. Does anyone seriously contend that the United States's responsibility for the consequences of its inaction would have been any less if the United States had stopped the refugee ships *before* they reached our territorial waters? Having promised the international community of nations that it would not turn back refugees at the border, the government yet contends that it may go out into international waters and actively prevent Haitian refugees from reaching the border. Such a contention makes a sham of our international treaty obligations and domestic laws for the protection of refugees.

6. Through this lawsuit, these refugees are not requesting admission to the United States, but are only seeking to have their claims for political asylum fairly considered.

### B. JURISDICTION AND APPEALABILITY

HRC contended in the court below that the APA gives it a cause of action to challenge the actions of lower executive branch officials in carrying out the interdiction program. The district court held that the APA afforded no such relief, on the grounds that the challenged agency actions were committed to agency discretion, and thus exempt from review. HRC properly seeks review of this adverse determination on appeal. The majority contends, however, that this court may not review the district court's holding on the APA claim because the district court ultimately granted injunctive relief on other grounds.

The denial or granting of a preliminary injunction gives this court jurisdiction to decide all the issues on which the district

---

2. In its Reply Brief the government states: As explained in our opening brief, the Executive Order and the INS guidelines are fully compatible with Article 33: if an INS interview suggests that a legitimate claim to refugee status exists, the person is to be removed from the interdicted vessel and transported to the United States, where the statutory provisions for withholding of deportation and asylum become applicable, as do our international obligations under the Protocol.

This is a long way of saying that the government will afford political asylum to those refugees it cares to, but will not afford any opportunity for review for those it denies relief. Consequently, the government will apply United States law to these refugees—in the middle of the sea—but will not have the application of United States law tested in United States courts. Since no other forum is available, the refugees are completely at the mercy of their captors. In fact, the capture prevents the refugees from seeking asylum in other countries.

court ruled, and the preliminary injunction may be upheld on the basis of any valid claim. 28 U.S.C. § 1292(a)(1). We are called upon to decide whether the preliminary injunction was properly issued on any ground asserted and determined. By not reviewing the APA claim, the majority takes an unrealistic and narrow view of this court's jurisdiction and role. In this highly expedited case, concerns of finality and conservation of judicial labor favor the swift resolution of all claims upon which the district court ruled.

Section 1292(a)(1) provides, in pertinent part:

" [T]he courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts ... granting, continuing, modifying, or *refusing* or dissolving injunctions, or refusing to dissolve or modify injunctions,...." (Emphasis added.)

The district court *refused* to grant the refugees the preliminary injunction on their APA claim; therefore, no jurisdictional impediment exists which prevents this court from reaching and deciding whether the preliminary injunction is proper based on the APA claim. *See Roberts v. St. Regis Paper Co.*, 653 F.2d 166 (5th Cir.1981). This court should reach and determine the merits of the APA claim.[3]

### C. ARTICLE 33

The majority holds that the district court erred in concluding that the 1967 United Nations Protocol Relating to the Status of Refugees (Protocol), which incorporates Article 33 of the 1951 Convention Relating to the Status of Refugees, gives refugees outside the territorial boundaries of the United States the right to press in domestic courts claims that the United States is violating obligations under the Protocol treaty.[4] Because Article 33 is self-executing and applies extra-territorially, I would uphold the preliminary injunction.

In the Protocol, a refugee is defined as any person who,

owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group, or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

Protocol, art. 1, ¶ 2, 19 U.S.T. 6223, 6225; T.I.A.S. No. 6577 at 3. Article 33, which is incorporated into the Protocol, provides:

No contracting state shall expel or return (refouler) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion.

Convention Relating to the Status of Refugees, art. 33, ¶ 1, 198 U.N.T.S. 150, 176 (July 28, 1951). Additionally, Article 3 of the Convention provides that the provisions of the Protocol are to be applied to all refugees without discrimination as to race, religion or country of origin. *See Conven-*

---

**3.** In *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (en banc), this court recognized that a reviewing court could uphold the relief granted by the lower court on grounds different from those relied upon by the lower court. The en banc court in *Jean* rejected the district court's holding that the plaintiffs (Haitians) could assert due process and equal protection challenges to the government's decision to detain or parole excludable aliens. 727 F.2d at 963. The court went on to hold however, that the Haitians could challenge the government's decision to detain them under an abuse of discretion standard. 727 F.2d at 975–76. The court stated:

The district court erred to the extent that it based its jurisdiction to review these determinations on constitutional grounds. The basis for jurisdiction here must be found elsewhere, in the principle that agencies must respect the statutory limits on their discretion, and in the recognition that agency deviation from its own internal regulations and procedures may justify judicial relief in a case otherwise properly before the court. 727 F.2d at 976 [internal quotations and citation omitted].

Thus in *Jean,* this court, sitting en banc, explicitly recognized that it could grant relief on grounds not even before the district court, especially where, as here, the substance of the claim for relief involves "agency deviation from its own regulations and procedures." 727 F.2d at 976.

**4.** This provision will be referred to as Article 33. The Protocol incorporates articles 2 through 34 of the Convention. The United States acceded to the protocol on November 1, 1968. 19 U.S.T. 6223; T.I.A.S. 6577.

tion, art. 3, 189 U.N.T.S. 150 (July 28, 1951). The majority holds that Haitian refugees outside the territorial boundaries of the United States have no right to challenge whether the procedures which implement the United States interdiction program violate the principles in the Protocol, regardless of whether the procedures are inadequate to ensure that refugees are not returned to territories where their lives or freedom will be threatened on account of their race, religion, nationality, membership in particular social groups or political opinions.

The majority so holds even though citizens or subjects of other nations ordinarily can enforce a treaty in the domestic courts of the United States to the extent that the treaty's provisions confer certain rights upon them and take on the nature of domestic law. *See Edye v. Robertson,* 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884). The former Fifth Circuit held that "treaties affect the municipal law of the United States only when those treaties are given effect by congressional legislation or are, by their nature, self-executing." *United States v. Postal,* 589 F.2d 862, 875 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *see also Whitney v. Robertson,* 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888). The provision of the Protocol which provides non-refoulement protection to refugees outside the United States has not been given effect by congressional legislation. *See Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir.1982) (holding that Congress has implemented the Protocol, at least in part, through the Refugee Act of 1980, but noting that the Refugee Act does not provide rights to aliens outside the United States). Nevertheless, the Protocol affects the domestic law of the United States and is binding upon the government to the extent that it is self-executing. *See Postal,* 589 F.2d at 875.

In *Postal,* the court held that "whether a treaty is self-executing is a matter of interpretation for the courts." *Postal,* 589 F.2d at 876. Additionally, the court noted in *Postal* that in determining self-execution, courts consider the parties' intent, the legislative history, and the subject matter of the treaty. *Postal,* 589 F.2d at 876–77.

However, the court also noted that it is difficult to ascribe a common intent to the language of a multilateral treaty which indicates a manifest purpose for the treaty to operate as the domestic law of the ratifying nations by its own force. *See Postal,* 589 F.2d at 878; *see also* Iwasawa, *The Doctrine of Self–Executing Treaties in the United States; a Critical Analysis,* 26 Va.J. Int'l L., 627, 656 n. 122 (1986); Note, *Interdiction: The United States Continuing Violation of International Law,* 68 B.U.L.Rev. 773, 780 (1988). Thus, consideration of the intent of the parties to the Protocol is least helpful, and the majority should have limited its consideration to the subject matter, legislative history, and subsequent treaty construction. *See Postal,* 589 F.2d at 876–77.

The Protocol's subject matter supports the proposition that the treaty is self-executing, because it neither explicitly calls for legislation nor requires positive legislative action, such as the appropriation of money or the imposition of sanctions. *See Postal,* 589 F.2d at 877; Note, *Interdiction,* 68 B.U. L.Rev. at 781. Additionally, the legislative history surrounding the Protocol further supports the conclusion that the treaty is self-executing. For example, the committee report recommending accession provided that the United States is automatically bound to apply articles 2 through 34 of the convention. *See* Sen.Exec.Rep. No. 14, 90th Cong., 2d Sess. (1968); *see also* Note, *Interdiction,* 68 B.U. L.Rev. at 785–86.

Finally, the subsequent construction of the Protocol also supports the proposition that it is self-executing. *See Nicosia v. Wall,* 442 F.2d 1005, 1006 n. 4 (5th Cir. 1971) (without recognizing implementing legislation, the court noted that the Protocol binds acceding states to apply certain provisions of the 1951 Refugee Convention); *Fernandez–Roque v. Smith,* 539 F.Supp. 925, 935 n. 25 (N.D.Ga.1982) (inclined towards view of self-execution); *see also Sannon v. United States,* 427 F.Supp. 1270, 1274 (S.D.Fla.1977) (holding that Protocol established aliens' right to a hearing), *vacated and remanded on other grounds,* 566 F.2d 104 (5th Cir.1978); *Matter of*

*Dunbar,* Interim Decision of Board of Immigration Appeals No. 2192,310 at 313 (April 17, 1973) (stating in regard to protocol that "such a treaty, being self-executing, has the force and effect of an act of Congress"); *but see Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir.1982) (holding that "the Protocol provisions were not themselves a source of rights under our law unless and until Congress implemented them by appropriate legislation"); *Haitian Refugee Center, Inc. v. Gracey,* 600 F.Supp. 1396, 1403–04 (D.D.C.1985) (holding the same as *Bertrand v. Sava* ), *aff'd on other grounds,* 809 F.2d 794 (D.C.Cir. 1987). Thus, although the intent of the parties is unclear, the subject matter, legislative history, and subsequent construction of the Protocol support the proposition that the Protocol is self-executing and binding upon the United States in accordance with Article VI of the United States Constitution.

After establishing that the Protocol is self-executing, the question becomes whether the Protocol's protections apply to refugees outside the territorial boundaries of the United States. The Supreme Court stated in *United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) that "the clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.' " *Stuart,* 489 U.S. at 365–66, 109 S.Ct. at 1191 (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982)). In his concurrence, Justice Scalia was even more emphatic, stating that "our traditional rule of treaty construction is that an agreement's language is the best evidence of its purpose and its parties intent." *Stuart,* 489 U.S. at 372, 109 S.Ct. at 1194. (Scalia, J., concurring). Article 33 unequivocally provides that "[n]o contracting state shall *expel* or *return* (refouler) a refugee," fleeing bona fide political persecution, *"in any manner whatsoever* to ... territories where [the refugee's] life or freedom would be threatened." Article 33, 198 U.N.T.S. at 176 (emphasis added). As noted earlier, it

is difficult to ascribe a common intent to the language of a multilateral treaty. *See Postal,* 589 F.2d at 878. Therefore, the clear import of the treaty language must control in determining the purpose of the treaty. *Compare United States v. Postal,* 589 F.2d 862, 875 (5th Cir.1979) (difficult to ascribe a common intent to the language of a multilateral treaty) *with United States v. Stuart,* 489 U.S. 353, 365–66, 109 S.Ct. 1183, 1191, 103 L.Ed.2d 388 (1989) (clear import of treaty language controls unless inconsistent with intent).

The Supreme Court also stated in *Stuart* that "the practice of treaty signatories counts as evidence of the treaties' proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *Stuart,* 489 U.S. at 369, 109 S.Ct. at 1193. Executive Order 12324 and the accompanying guidelines reflect the United States's understanding that the prohibition against refoulement is binding and protects Haitians interdicted on the high seas. Moreover, the district court correctly noted:

> it seems substantially unlikely that a protocol designed to protect refugees fleeing bona fide political persecution could have been intended not to provide protection to the Haitians fleeing the brutal, military regime now in power on the ground that those fleeing had not yet reached the territory of a party to the Protocol.

The United Nations High Commission for Refugees asserts that the terms of Article 33 and the nonrefoulement principle apply extraterritorially. The Supreme Court held in *Stuart* that

> given that a treaty should generally be 'construed ... liberally to give effect to the purpose which animates it,' and that 'even where a provision of a treaty fairly admits two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred.'

*Stuart,* 489 U.S. at 368–69, 109 S.Ct. at 1192–93 (quoting, *Bacardi Corp. of America v. Domenech,* 311 U.S. 150, 163, 61 S.Ct. 219, 225–26, 85 L.Ed. 98 (1940)).

Thus, Haitians interdicted on the high seas outside the territorial boundaries of the United States are entitled to the Protocol's protections.

## D. FIRST AMENDMENT

The district court did not err in finding a substantial likelihood of success on the grounds that the government had violated the Haitian Refugee Center's (HRC) First Amendment right of access to the interdicted Haitians. As this court has held, "counsel have a First Amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration." *Jean v. Nelson,* 727 F.2d 957, 983 (11th Cir.1984) (en banc); *see also In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). HRC seeks to exercise precisely such a right of access in this case. The fact that the Haitian refugees are currently outside the borders of the United States does not diminish HRC's right of access. The Haitian Refugee Center, a Florida nonprofit corporation, may invoke constitutional rights that are impaired by U.S. Government action abroad. *See United States v. Verdugo–Urquidez,* 494 U.S. 259, 270, 110 S.Ct. 1056, 1063, 108 L.Ed.2d 222 (1990); *Reid v. Covert,* 354 U.S. 1, 7, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957).[5]

With respect to the Guantanamo Bay Naval Station, an area under the "complete jurisdiction and control" of the United States, HRC is entitled to First Amend-

ment protection. Of course, HRC's First Amendment rights are constrained by the government's strong interest in regulating activities on its military bases. Like most military bases, the Guantanamo Bay Naval Station is a "nonpublic forum." *See MNC Hinesville v. United States Dept. of Defense,* 791 F.2d 1466, 1473 (11th Cir.1986). Consequently, the government may reserve it entirely for its intended purpose as a military base, so long as any restriction on speech is reasonable and content neutral. *Perry Education Association v. Perry Local Educators Association,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

The district court correctly found that the government acted unreasonably in denying HRC access to the interdicted Haitians. HRC seeks access only to that part of Guantanamo Bay used to detain interdicted Haitians. In that area, the government's purely military interests are diminished while HRC's interest in counseling the Haitians is increased. The government too shares an interest in ensuring that no political refugees are wrongfully repatriated. In gaining access to the Haitians, HRC helps the United States carry out its obligations under domestic and international law. Finally, as the district court noted, HRC has no alternative means of exercising the First Amendment right it asserts in this case. I would hold that the government must afford HRC access to the interdicted Haitians detained at Guantanamo Bay, subject to reasonable, content-neutral, time, place, and manner restrictions.[6]

5. The majority obviously accepts the government's contention that *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), controls HRC's first amendment claim. In *Kleindienst,* the plaintiffs claimed that their first amendment rights were violated by the exclusion of a foreign Marxist. In the instant case, HRC claims its first amendment rights are violated by the government's refusal to give it access to Haitians detained at Guantanamo Bay. The court's holding in *Kleindienst* that the plaintiffs' first amendment rights could not compel the government to grant entry to an excluded alien is simply irrelevant to the relief demanded by HRC in the instant case. Here, HRC seeks not entry of the Haitians, but access to them at the places where they are held by the U.S. government. Thus, the case is far more analo-

gous to the facts in *Jean v. Nelson,* 727 F.2d 957, 983 (11th Cir.1984) (en banc), where the court found a right of access, than to *Kleindienst,* where the court found no right of entry.

6. Contrary to the government's protestations, HRC seeks only such access as a remedy. It has never argued that a ban on repatriation is the only way to effectuate its first amendment right of access.

Even if the majority is correct in holding that the district court's preliminary injunction is too broad on the HRC's First Amendment claim, the district court should only be ordered to narrow the scope of the relief. Rather, the majority dissolves the preliminary injunction.

Because this case is alive in the district court on other issues not ruled upon, and because the preliminary injunction is well grounded in law, it should be left in place at least until the district court determines all the issues in the case.[7]

---

**7.** Due to the expedited nature of this case, this dissent only discusses issues the majority discusses. I agree to immediate issuance of the mandate and no further rehearing by this panel.