**HAITIAN REFUGEE CENTER, INC., et al., Plaintiffs–Appellees,**

v.

**James BAKER, III, Secretary of State, Robert Kramek, Rear Admiral, Kime, Admiral, Commandant, United States Coast Guard, Gene McNary, Commissioner, Immigration and Naturalization Service, United States Department of Justice, Immigration and Naturalization Service, United States of America, Defendants–Appellants.**

**HAITIAN REFUGEE CENTER, INC., a not-for-profit corporation, Roland Providence, Moise Charles, Eric Pierre, Raymond Edme, Golbert Miracle, Roland Jean, Roosevelt Alexis, Luc Luxembourg Sanon, Leger Pierre Frantz,**

**Ochel Engerril, Jean Michel Mario Avilus, Archille Belvu, Lucien Rozier, Emmanuel Saintil and Condanser Joseph, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees, Cross–Appellants,**

v.

**James BAKER, III, Secretary of State, Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard, Gene McNary, Commissioner, Immigration and Naturalization Service, United States Department of Justice, Immigration and Naturalization Service, and United States of America, Defendants–Appellants, Cross–Appellees.**

Nos. 91–6099, 91–6105 and 91–6118.

United States Court of Appeals, Eleventh Circuit.

Feb. 4, 1992.

Certiorari Denied Feb. 24, 1992.

See 112 S.Ct. 1245.

John F. Daly, Michael Jay Singer, Kenneth W. Starr, Edward T. Swaine, U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, D.C., for defendants-appellants.

Ira Kurzban, Kurzban, Kurzban & Weinger, Miami, Fla., Bruce Winick, University of Miami, School of Law, Coral Gables, Fla., for plaintiffs-appellees.

Before TJOFLAT, Chief Judge, HATCHETT and COX, Circuit Judges.

PER CURIAM:

## I. FACTS AND PROCEDURAL HISTORY

In 1981, President Ronald Reagan determined that the uncontrolled immigration of visaless aliens was a "serious national problem detrimental to the interests of the United States." Proclamation No. 4865, 46 Fed.Reg. 48,107 (1981), *reprinted in* 8 U.S.C.A. § 1182 note (1982). As a result of this determination, President Reagan issued an Executive Order directing the Secretary of State to enter "cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal immigration to the United States by sea." Exec.Order No. 12324, 46 Fed.Reg. 48,109, 48,210 (1981), *reprinted in* 8 U.S.C.A. § 1182 note (Executive Order). The Executive Order required the Secretary of Transportation to instruct the Coast Guard to enforce "the suspension of the entry of undocumented aliens and the interdiction of any defined vessels carrying such aliens." *Id.* at § 2(a). Among the "defined" vessels to be interdicted by the Coast Guard were vessels of foreign nations that had entered into agreements with the United States authorizing the United States to stop and board their vessels. *Id.* at § 2(b)(3).

The instructions given the Coast Guard were to include appropriate directives for it to stop and board defined vessels when there was reason to believe that such vessels were engaged in the irregular transportation of people or that the laws of the United States or the agreeing nation were being violated. Further, the Coast Guard was to determine the destination and status of those on board and to return the vessel to the country from which it came when there was reason to believe that the immigration laws of the United States or the foreign country were being violated. Finally, the Coast Guard was to be instructed not to return a "refugee" without his consent. *Id.* at § 2(c). These actions by the Coast Guard were authorized to be taken only outside the territorial waters of the United States. *Id.* at § 2(d).

Also pursuant to the Executive Order, the Attorney General, in consultation with the Secretary of State and the Secretary of Transportation, was to take steps necessary to "ensure the fair enforcement of our laws relating to immigration (including effective implementation of the Executive Order) and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland." *Id.* at § 3.

In compliance with the Executive Order, the Secretary of State entered into an agreement with the Haitian government under which the United States was authorized to interdict and board Haitian flagged vessels suspected of carrying illegal immigrants. T.I.A.S. No. 10,241. Under the agreement, it was understood that the United States would not return immigrants whom immigration officials determined to qualify for refugee status. *Id.* Also, Haiti agreed that any immigrants returned to Haiti would not be prosecuted for illegal departure. *Id.*

An "international obligation" to which the Executive Order refers and that is at issue in this case is the 1967 United Nations Protocol Relating to the Status of Refugees (Protocol). Article 33 of the Protocol provides in part as follows:

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

The term "refugee" as defined in the Protocol and incorporated in 8 U.S.C. § 1101(a)(42)(A) means:

[A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion,....

Pursuant to the Executive Order, the Immigration and Naturalization Service (INS) promulgated guidelines to be followed by INS employees assigned to the interdiction program. The Guidelines read as follows:

### INS ROLE AND GUIDELINES FOR INTERDICTION AT SEA

The following directives are to be followed by INS employees assigned to Coast Guard vessels interdicting vessels at sea pursuant to Presidential Proclamation 4865, dated September 29, 1981, and Executive Order Number 12324, dated September 29, 1981.

### GENERAL

* Due to the sensitive nature of this assignment, all INS employees will be under the direct supervision of INS Central Office Headquarters, Associate Commissioner, Examinations.

* The only function INS officers are responsible for is to ensure that the United States is in compliance with its obligations regarding actions toward refugees, including the necessity of being keenly attuned during any interdiction program to any evidence which may reflect an individual's well-founded fear of persecution by his or her country of origin for reasons of race, religion, nationality, membership within a particular social group or political opinion.

* The duties of INS employees assigned to United States Coast Guard vessels will be limited to matters related to the interview of persons on board with respect to documentation relating to entry to the United States and possible evidence of refugee status.

* Except for independent determinations with respect to documentation relating to entry into the United States and possible claims to refugee status, INS officers will be subject to maritime directives and rules made by the Commanding Officer of the United States Coast Guard vessel.

\*   \*   \*   \*   \*   \*

### BOARDING OF VESSELS

* All decisions relating to which vessels will be interdicted and in what manner vessels will be boarded will be made at the discretion of the Commanding Officer of the United States Coast Guard vessel.

* INS officers and interpreters will be members of each boarding party. INS employees will not be armed.

. * All initial announcements to the master, crew, and passengers of a boarded vessel as to the purpose of boarding, separation of crew and passengers, and general procedures (including advice that the boarded vessel may be returned to Haiti) will be made by United States Coast Guard personnel at the time the vessel is first boarded.

INS OFFICER RESPONSIBILITIES

A. To the extent that it is, within the opinion of the Commanding Officer of the United States Coast Guard vessel, safe and practicable, each person aboard an interdicted vessel shall be spoken to by an INS officer, through an interpreter. A log record shall be maintained of each such person, based on their responses to the following inquiries:

1. Name;
2. Date of Birth;
3. Nationality;
4. Home Town (*obtain sufficient information to enable a later location of the individual to check on possible persecution*);
5. All Documents or Evidence Presented;
6. Why did you leave Haiti;
7. Why do you wish to go to the United States;
8. Is there any reason why you cannot return to Haiti?

B. A copy of the log prepared by the INS officers shall be provided to the Commanding Officer of the Coast Guard vessel.

C. INS officers shall be constantly watchful for any indication (including bare claims) that a person or persons on board the interdicted vessel may qualify as refugees under the United Nations Convention and Protocol.

D. If there is any indication of possible qualification for refugee status by a person or persons on board an interdicted vessel, INS officers shall conduct individual interviews regarding such possible qualification.

E. Interviews regarding possible refugee status shall be conducted out of the hearing of other persons.

F. If necessary, INS officers will consult with Department of State officials, either on board, or via radio communications.

G. Individual records shall be made of all interviews regarding possible qualification for refugee status.

H. If the interview suggests that a legitimate claim to refugee status exists, the person involved shall be removed from the interdicted vessel, and his or her passage to the United States shall be arranged.

I. Individual record folders shall be prepared and maintained by INS officers in every case where a person is being sent on to the United States, and such record folder may be used to support such person's claim in the United States. (The individual folder shall contain a sworn statement by the applicants concerning the claim).

In September, 1981, the Coast Guard began interdicting vessels suspected of carrying undocumented aliens leaving Haiti bound for the United States. Upon interdiction of the boats, the passengers were interviewed by INS officials to determine their status. If the passengers were determined to be economic migrants, and not refugees, they were repatriated to Haiti. If they were determined to have a possible claim to political asylum, they were brought to the United States to continue the asylum process. Over the ten year period from 1981 to September, 1991, over twenty-five thousand migrants were interdicted.

On September 30, 1991, the democratically elected President of Haiti, Jean–Bertrand Aristide, was overthrown in a military coup. Following the coup, the United States suspended the interdiction program. Also, economic sanctions were imposed against Haiti. As a result of the coup and the economic sanctions, migration from Haiti increased.

On November 18, 1991, the United States announced that it would resume its interdiction and repatriation program. The next day, November 19, the Haitian Refugee Center, Inc. (HRC) filed a complaint seek-

ing declaratory and injunctive relief in the United States District Court for the Southern District of Florida. The defendants named are James Baker, III, Secretary of State; Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard; Gene McNary, Commissioner, Immigration and Naturalization Service; and the United States.

HRC sought a temporary restraining order enjoining the defendants from repatriating Haitians not identified as candidates for political asylum until the implementation of procedures adequate to protect Haitians qualifying for asylum. The complaint alleges that the defendants have failed to follow INS rules and procedures that were intended to protect against the forced return to Haiti of interdictees with potentially valid claims to political asylum. The complaint further alleges that the defendants' actions violated the terms of Executive Order 12324, the INS Guidelines promulgated pursuant to the order, and rules of international law, including Article 33 of the Protocol. Further, the complaint alleges that the defendants' actions deprived the interdictees of the protections set forth in the Refugee Act of 1980, the Immigration and Nationality Act (INA), and the due process protections of the Fifth Amendment of the Constitution. More specifically, the complaint alleges that interviews conducted on Coast Guard cutters were often as short as five minutes, were not conducted in private, and were conducted at a time when the Haitians suffered from a lack of adequate food and water and were otherwise in no condition for an adequate interview. Finally, the plaintiffs allege that the officers conducting the interviews were inadequately educated with respect to the political situation in Haiti to make sound judgments regarding claims for asylum.

The district court granted HRC's application for a temporary restraining order on November 19, 1991. The temporary restraining order precluded the defendants from repatriating Haitians on board U.S. flagged vessels or Haitians being held on land under United States control and at Guantanamo Bay, Cuba. The stated purpose of the order was to maintain the status quo "until further order."

On November 20, 1991, the defendants filed a motion to vacate the temporary restraining order or to stay the order pending appeal. These motions were denied by the district court on November 21, 1991. The district court granted plaintiffs' motion to expedite discovery and set a preliminary injunction hearing for November 27, 1991 [1].

On December 3, 1991, the district court granted the plaintiffs' motion for a preliminary injunction. The district court's order was grounded on a finding that there was a substantial likelihood that the plaintiffs would prevail on the merits of two judicially enforceable claims: (1) "HRC's right of association and counsel, which arises from the First Amendment to the United States Constitution;" and (2) "the Haitian plaintiffs' right of non-refoulement, which arises under Article 33 of the 1967 United Nations Protocol Relating to the Status of Refugees."

After determining that the plaintiffs had shown a substantial likelihood of success on these two claims, the district court went on to conclude that there was no substantial likelihood of success on the plaintiffs' remaining claims under the Fifth Amendment, the Executive Order, the INS Guidelines, the Refugee Act, the INA, and the APA.

First, the court followed settled law and found that these Haitian interdictees, who were not present in the United States, had no rights under the United States Constitution and therefore their Fifth Amendment claim must fail. Second, the court concluded that the protections afforded by the Refugee Act and the INA were limited "by the very terms of the statutes" to aliens

---

1. The defendants filed an emergency appeal of the district court's temporary restraining order, filed a petition for a writ of mandamus, and sought a stay of the expedited discovery order. On November 21, this court stayed the district court's discovery order. On November 22, this court lifted the stay of discovery, dismissed the appeal of the temporary restraining order for want of jurisdiction, and denied the petition for a writ of mandamus.

within the United States. Therefore, the Haitian interdictees had no enforceable claim on these grounds. Third, the district court found that the Executive Order created no independent right of action and that the INS Guidelines were more akin to internal operating procedures and thus could not form the basis for a judicially enforceable claim. Finally, the district court concluded there was no substantial likelihood of the plaintiffs succeeding on their APA claim. The court concluded that the actions in question were committed to agency discretion and thus not reviewable under the APA.

The defendants appealed that part of the district court's order granting injunctive relief on HRC's First Amendment claim and claim under Article 33 of the Protocol. This court expedited the appeal. We held that Article 33 of the Protocol is not self-executing and therefore did not give rise to any rights enforceable by the plaintiffs. We further held that the First Amendment claim did not support the injunction. We held that HRC asserted a right of access to the interdictees while the relief granted by the district court enjoined repatriation of the Haitians. Because the relief granted did not address the right asserted, the First Amendment claim did not support the injunction. We then dissolved the injunction and remanded the case to the district court with instructions to dismiss on the merits the claim based upon Article 33 of the Protocol. *Haitian Refugee Center, Inc. v. James Baker, III, Secretary of State,* 949 F.2d 1109 (11th Cir.1991). The court's mandate issued December 17, 1991.

Later that night the district court issued what purported to be another temporary restraining order. The district court had changed its mind since issuing its December 3, 1991 order and found that the plaintiffs had shown a substantial likelihood of success on their claim under the APA. The defendants filed an immediate appeal and motion for a stay pending appeal, arguing that the temporary restraining order was in effect a preliminary injunction. We agreed, concluded that we had jurisdiction and, pursuant to Fed.R.App.P. 8, stayed the order pending appeal. *Haitian Refu-*

*gee Center, Inc. v. James Baker, III, Secretary of State,* 950 F.2d 685 (11th Cir. 1991).

On December 20, 1991, after a hearing at which plaintiffs requested preliminary injunctive relief under the First Amendment, the Executive Order, the Refugee Act, and the INA, the district court granted "Limited Preliminary Injunctive Relief" based on HRC's claimed First Amendment right of access to the interdicted Haitians. In this order, the district court barred repatriation of the interdicted Haitians until plaintiffs' counsel was given meaningful access to the interdictees subject to reasonable, content-neutral, time, place, and manner restrictions. *Haitian Refugee Center, Inc. v. Baker,* No. 91–2653–CIV (S.D.Fla. filed Dec. 20, 1991) (order granting limited preliminary injunctive relief). The district court denied injunctive relief based on the plaintiffs' asserted rights under the Executive Order, the INA, and the Refugee Act, finding that the plaintiffs had failed to show a substantial likelihood of success on these claims. *Id.* The defendants immediately appealed that part of the order granting relief on the plaintiffs' First Amendment claim. The plaintiffs filed a cross-appeal challenging that part of the order denying relief on the claims predicated upon the Executive Order, the INA, and the Refugee Act. This appeal and cross-appeal are docketed in this court as No. 91–6105.

On December 23, 1991, following a hearing on the plaintiffs' request for a preliminary injunction based on the APA, the district court entered an order supplementing its December 20, 1991 order. This supplemental order granted the plaintiffs' request and enjoined the defendants from forcibly repatriating the Haitian interdictees pending resolution of plaintiffs' claims on the merits or until suitable procedures were implemented. The district court stayed this order pending appeal. The defendants' appeal of this supplemental order is docketed in this court as No. 91–6118.

We consolidated the defendants' appeal of the district court's December 17, 1991 order purporting to grant a temporary re-

straining order under the APA (No. 91–6099), their appeal of the December 20, 1991 order granting preliminary injunctive relief under the First Amendment (No. 91–6105), and their appeal of the December 23, 1991 supplemental order granting preliminary injunctive relief under the APA (No. 91–6118). These consolidated appeals have been expedited and are now ripe for decision.

## II.  ISSUES ON APPEAL

1.  Whether the district court erred in granting preliminary injunctive relief on the plaintiffs' claim that the APA authorizes judicial review of the defendants' actions under the law embodied in the Protocol, the Executive Order, the INA, the Refugee Act[2], and the INS Guidelines.

2.  Whether the district court erred in denying preliminary injunctive relief on the plaintiffs' claims to independently enforceable rights under the Executive Order, the INA, the Refugee Act, the INS Guidelines, and customary international law.

3.  Whether the district court erred in granting preliminary injunctive relief on the plaintiffs' claimed right of access under the First Amendment.

## III.  STANDARD OF REVIEW

■ The grant of a preliminary injunction is reviewed for abuse of discretion. However, if the trial court misapplies the law we will review and correct the error without deference to that court's determination. *Guaranty Fin. Servs., Inc. v. Ryan,* 928 F.2d 994, 998 (11th Cir.1991); *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 (11th Cir. 1989).

## IV.  JUDICIAL REVIEW
## UNDER THE APA

The plaintiffs contend that the APA authorizes review of their claims that repatri-ation violates the law embodied in the United Nations Protocol, the Executive Order, the INA, and the INS Guidelines. We disagree.

The plaintiffs claim that they have a right to judicial review of the defendants' compliance with the INA through the APA. We conclude that such review is precluded by the INA.

The INA expressly creates extensive rights of review regarding asylum claims and withholding of deportation claims, but only for aliens who have reached our borders. The INA provides no such provisions for review at the behest of aliens beyond our borders. This leads us to conclude that Congress intended to bar review to aliens similarly situated to the plaintiffs in this case.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 702. However, judicial review under the APA is not available where "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), or where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

■ In order to determine whether Congress intended to preclude judicial review under the APA, the courts look not only at the express language of the statute but the statutory scheme as a whole. *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984). The presumption favoring judicial review of administrative action may be overcome by Congressional intent inferred from contemporaneous judicial construction barring review and Congress's acquiescence in it. *Block,* 467 U.S. at 349, 104 S.Ct. at 2455.

■ In this case, judicial review under the APA is foreclosed because the relevant

---

2.  Although the plaintiffs assert a claim under the INA *and* the Refugee Act of 1980, we view their claim to be based on the INA as it has been amended by the Refugee Act of 1980. More specifically, we view their claim to be based primarily on 8 U.S.C. § 1253(h) as it was amended by the Refugee Act of 1980 and 8 U.S.C. § 1158(a) which was added to the INA by the Refugee Act.

provisions of the INA provide the sole and exclusive avenue for judicial review. Plaintiffs claim that the defendants have violated 8 U.S.C. § 1253(h) and contend that the defendants' determination is reviewable under the APA.

Section 1253(h) provides as follows:

The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

Section 1253(h) is included in Part V of the INA, which deals with deportation of aliens. The provisions of Part V dealing with deportation only apply to aliens within the United States. Therefore, 8 U.S.C. § 1252(b), which sets out the procedures for determining deportability of an alien, and which is also included in Part V of the INA, applies only to aliens "in the United States." 8 U.S.C. § 1251. Further, 8 U.S.C. § 1105a provides the exclusive procedure for judicial review of all final orders of deportation made pursuant to section 1252(b). Section 1105a provides in relevant part:

The procedure prescribed, and all the provisions of chapter 158 of Title 28 shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against *aliens within the United States* pursuant to administrative proceedings under section 1252(b) of this title or compatible provisions of any prior Act, ...

8 U.S.C. § 1105a(a) (emphasis added).

Contrary to the extensive procedures provided for with regard to aliens within the United States, 8 U.S.C. § 1157, which applies to refugees seeking admission from outside the United States, makes no provision for judicial review. Section 1157, as amended, gives the Attorney General discretion, within numerical limits, to permit refugees who are overseas to immigrate to the United States. No judicial review is

provided for. The extensive procedures set out in section 1252(b) and the procedures for judicial review provided for pursuant to section 1105a, along with the absence of procedures for judicial review provided in section 1157, demonstrate a Congressional intent to preclude judicial review at the behest of aliens beyond the borders of the United States.

The conclusion that no right to judicial review exists for aliens who have not presented themselves at the borders of this country is supported by case law. In *Brownell v. Tom We Shung,* 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956), the Supreme Court held that exclusion orders may be challenged, not only by habeas corpus, but by declaratory judgment action. The Court, however, limited its holding by stating that: "We do not suggest, of course, that an alien who has never presented himself at the borders of this country may avail himself of the declaratory judgment action by bringing the action from abroad." *Id.* at 184 n. 3, 77 S.Ct. at 255 n. 3.

In *Braude v. Wirtz,* 350 F.2d 702 (9th Cir.1965), 181 Mexican nationals brought suit to challenge an administrative determination denying them visas to enter the United States. The court held that these Mexican nationals, who had never sought admission at the borders of the United States, had no right to judicial review of the denial of their visas. In so holding the court cited the Supreme Court's language in *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950). In *Shaughnessy,* the Supreme Court stated:

When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under

such authority is final and conclusive. Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly authorized by law to review the determination of the political branch of the Government to exclude a given alien.

338 U.S. at 542–43, 70 S.Ct. at 312.

In *Cobb v. Murrell*, 386 F.2d 947 (5th Cir.1967),[3] the Fifth Circuit followed *Braude* and held that a Mexican alien outside the United States without a visa had no standing to challenge a determination of the Secretary of Labor denying her a visa. The court went on to state that "Congress can make an administrative officer the apogee of finality, and no constitutional safeguard requires judicial review in denying entry to aliens." *Id.* at 951.[4]

Finally, in *Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970 (9th Cir.1986), the Ninth Circuit affirmed the district court's dismissal of the case for lack of jurisdiction to review the acts of consular officials in denying visas. The court stated that the power of Congress to exclude aliens altogether from the country or to prescribe the conditions of such entry and to have its declared policy in that regard enforced exclusively through the executive branch, without judicial interference, is well settled. *Id.* at 971 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972).

The foregoing cases evidence Congress's intent to preclude judicial review of administrative determinations concerning aliens who have never presented themselves at the borders of the country. Review under the APA would be inconsistent with that intent.

■ Assuming, *arguendo*, that the action in question is within the scope of the APA, the government argues that APA review is nevertheless barred by 5 U.S.C. § 701(a)(2). Section 701(a)(2) provides that the APA does not apply where "agency action is committed to agency discretion by law." This exception, however, is very narrow. It is applicable only when the statute granting agency discretion is so broad that it provides no law for courts to apply when reviewing the agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971).

8 U.S.C. § 1182(f) clearly grants the President broad discretionary authority to control the entry of aliens into the United States. Section 1182(f) grants the President the discretion to act to exclude aliens "as he deems necessary." Pursuant to this power, President Reagan issued Executive Order 12324 authorizing the interdiction of illegal aliens at sea. HRC concedes that the President's order is not reviewable under the APA. They argue that the President's subordinates are not carrying out his directive and that their failure to do so is subject to judicial review[5]. Further, they argue that the defendants' actions violate 8 U.S.C. § 1253(h), which provides that the Attorney General shall not deport or return an alien if it is determined that he will be subject to persecution. Their claim, however, is not based on a challenge to any individual determination made by the INS officers. Rather, the plaintiffs challenge the procedure used to interview the inter-

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**4.** Plaintiffs argue that *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir.1961), supports their position that the APA should be applied in this case. *Estrada* dealt with an alien who held a valid visa and subsequently was refused entry. In this case the plaintiffs have never reached the United States so *Estrada* is not controlling.

Further, the court in *Estrada* distinguishes the facts of its case from those of an alien initially applying for a visa. The court stated that "an alien initially applying for a visa, however, may be summarily turned down by the American consul. Such refusal is usually considered immune to judicial review." *Id.* at 692 n. 2.

**5.** The logical extension of this argument would make all of the President's discretionary decisions subject to review except in matters he can personally execute without the assistance of subordinates.

dictees in order to determine which ones are subject to being repatriated.

We begin by noting that this court's decision in *Greenwood Utilities Comm'n v. Hodel,* 764 F.2d 1459 (11th Cir.1985), appears to bar HRC's claim. In *Greenwood,* a panel of this court held that "[o]nly if a specific *statute* somehow limits the agency's discretion to act is there sufficient 'law to apply' as to allow judicial review." *Id.* at .1464 (emphasis added). Neither § 1182(f), § 1253(h) ·nor any other act of Congress relied on by the plaintiffs provide any guidance regarding the procedures to be used in making repatriation decisions with respect to aliens who have not yet reached the United States. Without such congressionally-mandated limits on agency authority, it is inappropriate for this court to exercise judicial review over the operation of the executive branch.

In a decision which appeared shortly after *Greenwood,* however, another panel of this court suggested in a footnote that "[e]ven when a decision is committed to agency discretion, a court may consider allegations that an agency failed to follow its own binding regulations." *Florida, Dep't of Business Regulation v. United States Dep't of the Interior,* 768 F.2d 1248, 1257 n. 11 (11th Cir.1985), *cert. denied* 475 U.S. 1011, 106· S.Ct. 1186, 89 L.Ed.2d 302 (1986). Although the *Florida, Dep't of Business Regulation* panel did not address *Greenwood* and relied instead upon an earlier Third Circuit decision, we will apply the panel's analysis in *Florida, Dep't of Business Regulation* to this case.

HRC claims that INS and Coast Guard officials are violating Executive Order 12324's requirement that "no person who is a refugee will be returned without his consent." This command, however, in no way limits the discretion of INS officials in their determination of who qualifies as a refugee or the procedures to be used to make such a determination. It does not identify any specific factors to be considered or suggest how competing interests must be balanced. The determination of refugee status rests solely with the INS official. Since the Order does not constrain that official's discre-

tion, it cannot provide this court with any "meaningful standard against which to judge the [official]'s exercise of discretion." *See Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

HRC also argues that the INA, international treaties, and the INS Guidelines constrain INS officials' discretion in determining who is a refugee. The Executive Order does provide that the Attorney General shall ensure fair enforcement of immigration laws and strict observance of our international obligations. As noted above, however, the INA does not extend its protection to aliens who have never entered the United States. Furthermore, although Article 33 provides that no refugee will be returned to a country if he has a well-founded fear of persecution, it provides no standards against which to judge the procedures about which the plaintiffs complain. Finally, the INS Guidelines issued pursuant to Executive Order 12324 provide no meaningful standards for judicial review. ·

As with the Executive Order itself, the exercise of the INS· officer's discretion in determining who has a legitimate claim to refugee status is in no way constrained by the INS Guidelines. There are, therefore, no "binding regulations" which limit agency discretion in such a way as to permit meaningful judicial review. *See Florida, Dep't of Business Regulation,* 768 F.2d at 1256–57.

Because the action in question is "committed to agency discretion," HRC's claim for APA review is also barred by 5 U.S.C. § 701(a)(2).

The conclusion that APA review is not available in this situation is supported by Supreme Court precedent. In the case of *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), the Supreme Court held that the APA was not applicable to deportation proceedings. *Marcello,* 349 U.S. at 308, 75 S.Ct. at 757. The Court discussed the case of *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), in which ·it had held that the APA was applicable to proceedings under the Immigration and Nationality Act of 1917. *Marcello,* 349 U.S. at 306, 75 S.Ct.

at 760. The Court noted that six months after their decision in *McGrath*, Congress legislatively overruled it by providing in a rider to the Supplemental Appropriation Act of 1951, 64 Stat. 1048, that proceedings concerning the expulsion and exclusion of aliens should not be governed by sections 5, 7 and 8 of the APA. *Id.* Next, the Court examined the procedures concerning deportation under the Immigration and Nationality Act of 1952 to determine if Congress had intended to have the APA apply to this new act. After a very detailed analysis of the deportation proceedings provided for in section 242(b) of the then new Immigration Act, the Court stated that:

> Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in § 12 of the Act that modifications must be express. But we cannot ignore the background of the 1952 immigration legislation, its laborious adoption of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative history of this adoptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings. Unless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act.

*Marcello,* 349 U.S. at 310, 75 S.Ct. at 762.

In a recent decision, *Ardestani v. INS,* — U.S. ——, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991), the Supreme Court interpreted its holding in *Marcello* and held that "Congress intended the provisions of the Immigration and Nationality Act of 1952 (INA), 66 Stat. 163, as amended, 8 U.S.C. 1101 *et seq.,* to supplant the APA in immigration proceedings." *Id.* at ——, 112 S.Ct. at 518.

## V. OTHER MISCELLANEOUS CLAIMS

Plaintiffs also claim that they have independent judicially enforceable rights under the Executive Order, the INS Guidelines, and the INA, as it was amended by the Refugee Act of 1980. In its order dated December 3, 1991, the district court refused to grant injunctive relief based on these claims and reiterated this holding in its order dated December 20, 1991 which granted limited preliminary injunctive relief on HRC's First Amendment claim. The plaintiffs cross-appeal, asserting that the district court erred in refusing relief on these other claims. For the reasons stated below, we agree with the district court's rulings on these issues.

### A. *Plaintiffs' Claim under the INA and the Refugee Act*

The plaintiffs claim that they have judicially enforceable rights under the INA because the defendants' actions violate 8 U.S.C. § 1253(h) as it was amended by the Refugee Act. They argue that this section is applicable to them even though they have not reached the United States. They argue that the 1980 amendment to this section shows Congressional intent to extend the section's application.

Before this section was amended by the Refugee Act, § 1253(h) provided as follows:

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

8 U.S.C. § 1253(h) (1976 ed.)

After the 1980 amendment, § 1253(h) was changed in relevant part as follows: "The Attorney General shall not deport *or return* any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country ..." (emphasis added). Plaintiffs argue that because the amendment added the words "or return" and deleted the words "within the United States," Congress must have intended to expand the scope of the statute to include aliens be-

yond the borders of the United States. We disagree.

As discussed above in Section IV, section 1253(h) is found in Part V of the INA, which deals with deportation and adjustment of status. The provisions of Part V of the INA dealing with deportation only apply to aliens "in the United States." 8 U.S.C. § 1251, 1253(a); *Haitian Refugee Center, Inc. v. Gracey*, 600 F.Supp. 1396, 1404 (D.D.C.1985), *aff'd on other grounds*, 809 F.2d 794 (D.C.Cir.1987). The language of § 1253(h) was changed to conform with Article 33 of the Protocol. The plaintiffs in this case cannot avail themselves of any judicially enforceable rights under section 1253(h).

■ Finally, the INA's asylum provision which was added by the Refugee Act of 1980 is also limited by its terms to aliens in the United States or at its borders or a port of entry. Section 1158(a) states as follows:

> The Attorney General shall establish a procedure for *an alien physically present in the United States or at a land border or port of entry*, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

8 U.S.C. § 1158(a) (emphasis added).

We agree with the district court that the clear meaning of this language is that the plaintiffs in this case—who have been interdicted on the high seas—cannot assert a claim based on the INA or the Refugee Act.

Plaintiffs argue that the language of § 1158(a) should be read to include a land border or port of entry *or* its functional equivalent. Plaintiffs contend that because the United States Government is reaching out into the Caribbean to interdict them, it is effectively extending the borders to that extent. We decline to interpret the statute this broadly. The plain language of the statute is unambiguous and limits the application of the provision to aliens within the United States or at

United States' borders or ports of entry. *See Haitian Refugee Center v. Gracey*, 600 F.Supp. 1396, 1404 (D.D.C.1985), *aff'd on other grounds*, 809 F.2d 794 (D.C.Cir. 1987). The plaintiffs in this case have been interdicted on the high seas and have not yet reached "a land border" or a "port of entry." Therefore, their claims under the INA must fail.

### B. *Plaintiffs' Claim under the Executive Order*

■ Congress has committed to the President broad authority to control the entry of aliens or of any class of aliens when he determines that it would be detrimental to the interests of the United States. 8 U.S.C. § 1182(f). The President may suspend or restrict the entry of aliens for the period he deems necessary and impose the restrictions he deems appropriate. *Id.* Pursuant to this broad grant of authority, President Reagan issued Executive Order 12324.

The plaintiffs assert that the Executive Order provides a basis for a private cause of action that may be enforced by the district court pursuant to its federal question jurisdiction. Plaintiffs contend that the Executive Order embodies, and on its own terms sets forth, the law against forced return of political refugees. Specifically, the plaintiffs rely on the language in the Executive Order that says "no person who is a refugee will be returned without his consent."

Assuming that the district court has jurisdiction to review a claim based on the Executive Order, plaintiffs still must state a cause of action on which relief can be granted. *See Farkas v. Texas Instrument, Inc.*, 375 F.2d 629 (5th Cir.), *cert. denied* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967). We hold that the Executive Order does not give rise to a private cause of action.

The Executive Order was issued specifically to establish a procedure for interdiction of Haitian migrants on the high seas. The program was intended as an emergency measure to deal with a situation that the

President determined to be detrimental to the interests of the United States. By its terms, the Executive Order envisioned a procedure taking place entirely on the high seas. It contemplated a procedure that could quickly screen those on board interdicted boats and determine who had potential claims of persecution that would prevent repatriation. Because of the nature of the screening process and the fact that it was to take place on the high seas, it could not have been the intention of the President to allow the interdictees to initiate judicial review of their cases in the district courts of the United States. A private civil action was not contemplated under Executive Order 12324 and the plaintiffs' claim based on this order does not state a claim upon which relief can be granted.

### C. Plaintiffs' Claim under the INS Guidelines

█ Plaintiffs also contend that they have substantive rights under the INS Guidelines which are being violated by the defendants' actions in this case. We disagree. The INS Guidelines, as discussed above, create no substantive rights that can be judicially enforced. The guidelines are more akin to internal operating instructions as opposed to regulations. As such, they do not have the force and effect of law. *Pasquini v. Morris*, 700 F.2d 658 (11th Cir.1983); *Dong Sik Kwon v. INS*, 646 F.2d 909 (5th Cir.1981).

In *Pasquini*, this court analyzed an internal operating instruction of the INS, O.I. 103.1(a)(1)(ii), and determined that the INS's internal operating instructions came within the exception to the APA's procedure for publication in the Federal Register of all proposed rulemaking by administrative agencies.

Section 553(b) of the APA provides, with certain exceptions not applicable here, that the publication procedures do not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure or practice ..." 5 U.S.C. § 553(b). The court concluded that internal operating

instructions fell within this category "since the INS considers such instructions to be internal directives, not having the force and effect of law as do regulations." *Pasquini*, 700 F.2d at 662 (citing *Dong Sik Kwon*, 646 F.2d at 918) (internal quotes omitted). Finally, the court held that "[t]he internal operating procedures of the INS are for the administrative convenience of the INS only." *Id.*

We hold that the INS Guidelines in this case are internal guidelines for employees of the INS. These Guidelines were sent in the form of a memorandum to INS employees assigned to duties relating to the interdiction program. They were not intended to grant substantive rights but were only intended to give guidance to those INS employees involved in the interdiction program. The district court correctly denied injunctive relief based on this claim.

The plaintiffs also claim that customary international law, or international common law, creates enforceable rights. This claim is meritless and does not warrant discussion.

### VI. HRC'S FIRST AMENDMENT RIGHT OF ACCESS

█ One of the grounds relied upon by the district court in issuing the December 3, 1991 preliminary injunction against repatriation of the interdicted Haitians was HRC's claimed First Amendment right of access to those Haitians.[6] This court vacated that preliminary injunction on December 17, 1991. At that time we did not address HRC's First Amendment claim on the merits. Rather, this court held that HRC's purported First Amendment right of access to the Haitians could not support the preliminary injunction because the injunction merely barred repatriation and did not grant the access sought.

The injunctive relief granted by the district court does not require the defendants to allow HRC access to the Haitian interdictees, it enjoins the defendants from repatriating them. Because the re-

---

**6.** We agree with the district court's conclusion that the Haitian refugees do not have correlative First Amendment rights of their own. *See* Dec. 3, 1991 Memorandum Order at 44.

lief granted does not address the right of access asserted by HRC, the First Amendment claim cannot support the injunction.

*Haitian Refugee Center v. Baker,* 949 F.2d 1109, 1111 (11th Cir.1991).

On remand, the district court reiterated its conclusion that HRC has a First Amendment right of access to the interdicted Haitians. The court found that, with respect to Guantanamo Bay Naval Station, HRC sought access to portions of the installation which were being used for the non-military purpose of detaining refugees. Dec. 20, 1991 Order at 9. The district court also found that HRC lacked alternative means of exercising its First Amendment right other than direct access to the interdicted Haitians in United States custody. *Id.* The court then issued the following injunctive relief:

> [F]or the reasons described in section III, plaintiffs' request for an injunction ordering defendants to grant plaintiffs' access to the interdicted class members is *GRANTED* as follows: defendants shall grant plaintiffs' counsel meaningful access to its interdicted class members, before repatriation, subject to reasonable, content-neutral, time, place and manner restriction....

*Id.* at 11.

On appeal, the United States argues that HRC has no First Amendment right whatsoever to communicate with aliens being held outside the United States. The government also maintains that the district court's preliminary injunction is overly broad and imposes affirmative obligations on the United States. HRC, on the other hand, claims that "[t]he denial of access to the emigrees [sic] on Coast Guard cutters and at Guantanamo Bay Naval Station violates the rights of the HRC, whose organizational purpose has been thwarted in that it has been unable effectively to provide assistance to the refugees including legal assistance and information concerning their legal rights." [7] HRC also argues

that the issue of whether the preliminary injunction requires access to Coast Guard ships is not ripe for review since the district court has not resolved this question. Because we can find no support for its claim in the laws or Constitution of the United States, we hold that HRC has failed to state a claim upon which relief can be granted.

The cases that the district court relies upon to justify its conclusion that HRC is likely to prevail in its First Amendment claim—*NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978)—do not recognize a right of access to persons properly in government custody. In *Button,* the National Association for the Advancement of Colored People (NAACP) challenged a Virginia statute that proscribed "the improper solicitation of any legal or professional business." 371 U.S. at 419, 83 S.Ct. at 331. The Supreme Court of Virginia had interpreted this statute as prohibiting "any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys." *Id.* at 433, 83 S.Ct. at 338. This ban encompassed the NAACP's efforts to encourage others to bring suits, with the assistance of the NAACP's legal staff, challenging segregation in Virginia's public schools. *Id.* at 426, 83 S.Ct. at 334. The United States Supreme Court held "that the activities of the NAACP [soliciting prospective litigants] ... are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not *prohibit,* under its power to regulate the legal profession...." *Id.* at 428–29, 83 S.Ct. at 335 (emphasis added). Thus, the Court held that the statute, as applied to the NAACP, unconstitutionally infringed the organization's rights of free speech and association. *Id.*

Similarly, in *In re Primus,* the Supreme Court held that the South Carolina Supreme Court had unconstitutionally infringed the associational rights of an American

---

**7.** The district court noted that there was no allegation that the government's denial of access to the interdicted Haitians was the product of

viewpoint discrimination. See Dec. 3, 1991 Memorandum Order (incorporated into Dec. 20, 1991 Order at 8).

Civil Liberties Union (ACLU) staff attorney by publicly reprimanding her after she solicited a potential litigant by mail on behalf of the ACLU. 436 U.S. at 439, 98 S.Ct. at 1908. The potential litigant had been sterilized as a condition of receiving public medical assistance. *Id.* at 415, 98 S.Ct. at 1896. The Court noted that "[t]he First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights,'" *Id.* at 432, 98 S.Ct. at 1904–05 (quoting *Button,* 371 U.S. at 437, 83 S.Ct. at 340). Finding that "[t]he ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public," *id.* 436 U.S. at 431, 98 S.Ct. at 1904, the Court concluded that South Carolina's disciplinary rules could not constitutionally be applied to the ACLU attorney's solicitation of a potential litigant by letter since that solicitation was "intended to advance beliefs and ideas." *Id.* at 438 n. 32 & 439, 98 S.Ct. at 1908 & n. 32.

*Button* and *In re Primus* recognize a narrow First Amendment right to associate for the purpose of engaging in litigation as a form of political expression. This right is predicated upon the existence of an underlying legal claim that may be asserted by the potential litigant. *See Button,* 371 U.S. at 440, 83 S.Ct. at 341 ("the exercise ... of First Amendment rights to enforce constitutional rights through litigation, as a matter of law, cannot be [prohibited]"). In the present case, the interdicted Haitians have no recognized substantive rights under the laws or Constitution of the United States.[8] Thus, it would be nonsensical to find that HRC possesses a right of access to the interdicted Haitians for the purpose of advising them of their legal rights.

Even assuming *arguendo* that HRC has some limited right to associate with inter-

dicted Haitians who are detained outside of the United States and who themselves have no substantive rights enforceable in the United States, this right of association would not give rise to the right of access that HRC claims. In reality, HRC's claim is that it has a right to associate with the interdicted Haitians and it has a right to compel the Government to assist it in exercising that right. The Constitution, however, does not require the Government to assist the holder of a constitutional right in the exercise of that right. *Ukrainian–American Bar Ass'n. v. Baker,* 893 F.2d 1374, 1381 (D.C.Cir.1990); *see also DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) ("the Due Process clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"); *Harris v. McRae,* 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980) ("[a]lthough the liberty protected by the Due Process Clause affords protection against unwarranted government interference ..., it does not confer an entitlement to such [government assistance] as may be necessary to realize all the advantages of that freedom"). Thus, associational freedom in no way implies a right to compel the Government to provide access to those with whom one wishes to associate. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 9 & 15, 98 S.Ct. 2588, 2594 & 2597, 57 L.Ed.2d 553 (1978) (acknowledging that the media has a right to communicate information once it is obtained yet holding that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control"). Cer-

---

**8.** The district court previously concluded that the interdicted Haitians have no rights under the United States Constitution. *See* Dec. 3, 1991 Memorandum Order at 44. Today, we express agreement with that conclusion. *See ante* at 1511 n. 6. Moreover, we decide today that the interdicted Haitians have none of the substantive rights—under Executive Order No. 12324,

the 1967 United Nations Protocol Relating to the Status of Refugees, the Immigration and Naturalization Service Guidelines, the Refugee Act of 1980, the Immigration and Nationality Act, or international law—that they claim for themselves or that the HRC claims for them. *See ante* at 1514–15.

tainly, neither *Button* nor *In re Primus* supports the conclusion that the Government infringes associational freedom when it denies access to those whom it lawfully detains.

The district court's preliminary injunction extends to grant HRC access to Haitians aboard Coast Guard ships at sea. As noted above, HRC suggests that we need not address this issue until the district court has resolved the entire First Amendment claim on its merits. The preliminary injunction, however, clearly raises this question. By its terms, the injunction extends to all "interdicted class members." These class members are being held both at Guantanamo Bay Naval Station and on Coast Guard cutters. The order is in no way limited to those Haitians at Guantanamo. It is equally applicable to those interdictees currently on Coast Guard ships, as well as those who may be on board Coast Guard ships in the future. Indeed, under the injunction the United States may not repatriate the Haitians aboard Coast Guard ships until HRC has been granted access to them. We also note this relief is consistent with that sought by HRC in its amended complaint, which specifically requests access to Haitians both at Guantanamo and on Coast Guard ships.

Providing access to these ships would impose a substantial burden on the United States. Such access would interfere with the ships' "intended purposes" of interdicting and screening the Haitian migrants and returning those deemed to be ineligible for refugee status. Coast Guard officials would be forced to either remove the ship from the theater of operation or suffer the presence of untrained civilians while conducting their mission. In order to provide access to the Haitians aboard the Coast Guard cutters, the United States must put the Haitians ashore at Guantanamo, in the United States, or elsewhere or, alternatively, transport HRC representatives to the ships themselves. Either way, the United States is forced to assist HRC and subsidize the pursuit of its objectives.

Similarly, with reference to the Haitians being held at Guantanamo Bay Naval Station, the United States must hold the interdicted Haitians in custody—at tremendous expense to the American taxpayer—to assist HRC in its right to "meaningful access." Presumably, the government is also obligated to provide HRC representatives with transportation to and from Guantanamo, as well as shelter and other necessities while they are there.

Directly on point is *Ukrainian–American Bar Ass'n*. In that case, the Ukrainian–American Bar Association (UABA) brought suit to establish its "rights of access to [Soviet aliens seeking asylum in the United States] under the First Amendment to counsel such individuals regarding their Constitutional and statutory right to apply for political asylum." 893 F.2d at 1377. The United States Court of Appeals for the D.C. Circuit framed the issue presented as "whether the Government, once having acted to place [an] alien in custody, violates the first amendment rights of third parties when it declines to make provision for them to contact him." *Id.* at 1381. The court acknowledged that *Button* and *In re Primus* recognize a First Amendment right to solicit clients to engage in litigation as a form of political expression. *Id.* The court concluded, however, that the Government does not infringe that right when it refuses to provide access to an alien in its custody who is seeking political asylum:

> [W]hen an unadmitted alien is taken into custody for interrogation and "immediate action," his entrance into custody does not infringe the right of any third party—whether a lawyer or another with an interest in getting a message through to the alien—to engage in constitutionally protected political expression....

> Furthermore, the Government does not infringe a third party's first amendment right to associate with an alien by holding the alien for a period of time during which the third party is unable to contact him. The loss of the right of association while the alien is held incommunicado by the Government is not of constitutional significance; it is but an indirect consequence of the Government's pursuit of

an important task, *viz.* resolving "immediate action" cases.

*Id.*

HRC does not assert that the Government seeks to repatriate the interdicted Haitians *in order to* interfere with HRC's associational freedom. Indeed, in light of the record before us, it would be absurd for HRC to make such an allegation. HRC's claim is, therefore, nothing more than a claim that it has a right to compel the Government to assist it in exercising a right of association. *Any* court order enforcing this so-called "right" would impose an inappropriate affirmative obligation on the Government. This is more than the Constitution requires. We hold, therefore, that HRC's claim to a right of access to the interdicted Haitians is not a claim upon which relief can be granted and instruct the district court on remand to dismiss it.

## VII. CONCLUSION

### Case No. 91–6099

The "temporary restraining order" issued on December 18, 1991, has expired by its terms. The appeal of that order, our Case No. 91–6099, is DISMISSED as MOOT.

### Case No. 91–6105 and 91–6118

All injunctive orders issued by the district court in its Case No. 91–2653–CIV are VACATED. The case is REMANDED to the district court. The district court is instructed upon remand to dismiss the action because the complaint fails to state a claim upon which relief can be granted.

The mandate shall issue immediately.

INJUNCTION ORDERS VACATED; REMANDED WITH INSTRUCTIONS.

HATCHETT, Circuit Judge, dissenting:

I respectfully dissent. We should examine what is really involved in this case. Reading the majority opinion, one might suppose that many precedents and principles of law prevent the Haitian Refugee Center (HRC) from having meaningful access to the refugees at Guantanamo Bay and on Coast Guard vessels. In reality, that is not the case. The principal matters before this court are: (1) whether the refugees have rights under the Administrative Procedures Act (APA), and (2) whether HRC has a First Amendment right to meaningful access to the refugees.[1] The district court correctly ruled that (1) the refugees have the right under the APA to be properly interviewed, and (2) HRC has a First Amendment right of access in accordance with reasonable time, place, and manner limitations. Consequently, the district court ordered the government not to repatriate the refugees before HRC's representatives were given the opportunity to counsel them regarding their rights and status in the present situation. Although the district court allowed the government to impose strict limitations, the government has steadfastly refused to allow HRC meaningful access to the refugees, under any circumstances.

The majority cites many cases for many legal propositions, but when all is said and done, the majority simply accepts the government's contention that these refugees have no enforceable rights in an American court because they have not reached the continental United States. For the majority, that is the heart of the matter; the refugees are outside of the United States. The government makes the "outside the United States" argument, and the majority accepts it, although everyone in this case agrees that agencies of the United States captured the refugees and are holding them on United States vessels and leased territory. Moreover, the majority accepts this argument although everyone in the case agrees that the refugees are being prevented from reaching the shores of the continental United States.[2] The ma-

---

1. Other issues were brought to the court through HRC cross-appeal, but will not be addressed in this dissent due to the expedited nature of this case.

2. As stated in a previous dissent, the capture of Haitian refugees in international waters is authorized under a 1981 agreement between the Reagan administration and the totalitarian government of Jean–Claude "Baby Doc" Duva-

jority accepts a pure legal fiction when it holds that these refugees are in a different class from every other "excludable alien" because Haitians, unlike other aliens from anywhere in the world, are prevented from freely reaching the continental United States.[3]

In addition to accepting this pure legal fiction, the majority fails to follow at least two well established principles of American law. First, from the beginning, the majority has proceeded as though called upon to decide the issues on the merits, rather than to review the appropriateness of the district court's entry of preliminary injunctions. Under our circuit's law, the majority should have reviewed the appropriateness of the district court's preliminary injunctions by considering whether HRC and the refugees have proved: (1) a substantial likelihood of prevailing on the merits of their claims; (2) a substantial threat of suffering irreparable injury in the absence of an injunction; (3) that the threatened injury to them outweighs the potential harm an injunction would cause the government; and (4) that the injunction would not be adverse to the public interest. *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555 (11th Cir.1989).

Secondly, the majority determines the issues on appeal as though they are purely matters of law, without considering the district court's findings of fact. For example, early in this case, the majority held that the district court's First Amendment *remedy* was too broad because the Guantanamo Naval Base is a military installation and military activities would be disrupted if a few lawyers visited the refugee compound.[4] To the contrary, the district court found that the refugees are being held in a portion of the base not used for military purposes. The record in this case shows that television reporters, church officials, political activists, congressmen, and a host of other people regularly visit the Haitian compound at Guantanamo, evidently without disrupting military operations.

Among the other district court findings the majority ignores, are the following: The refugees fled Haiti because of the overthrow of the legal government; *many face irreparable and even fatal injury*, if returned; the government's harms, if any, are monetary and speculative; low level officials are not screening according to the INS guidelines; screening procedures are inadequate; conditions in Haiti have worsened in the last month [November–December, 1991]; *refugees who have been returned have faced persecution;* the Haitian Red–Cross is under the control of the military; and the government continues to deny HRC's representatives access to the refugees. Had the majority seriously considered these factual findings and reviewed the preliminary injunctions under the proper standards, it would have concluded, as I do, that the preliminary injunctions were properly issued.

## I.  THE FIRST AMENDMENT CLAIM

In an earlier opinion, the majority stated that the injunction granted by the district court was too broad to serve the First Amendment right of access asserted by HRC. *HRC v. Baker*, 949 F.2d 1109, 1111 (11th Cir.1991). In its opinion today, the majority holds that HRC has no such right. While I concur in the majority's conclusion that HRC's right of access to the interdicted Haitians cannot compel the government to allow it aboard United States Coast Guard cutters on the high seas, I dissent from the remainder of the majority's opinion on the First Amendment issue.

As a reviewing court, we must clearly state the law. In *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984) (en banc), a case the majority completely ignores, we did so. "The Supreme Court has repeatedly emphasized that counsel have a first amend-

---

lier. The record does not disclose such an agreement with any other country.

**3.** This court noted in *Jean v. Nelson*, 727 F.2d 957, 961 n. 1 (11th Cir.1984) (en banc): "[A]liens who have reached our border but have not formally been admitted to the United States are described as 'excludable' ... aliens."

**4.** Surprisingly, at this stage of the case, the majority holds that HRC has no First Amendment rights.

ment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration...." 727 F.2d at 983. HRC asserts precisely such a right in this case. Yet, despite *Jean*, the majority concludes that HRC has no First Amendment right of access to the refugees, because the refugees themselves have no rights. One conclusion simply does not follow from the other. Nothing in *Jean* predicates HRC's First Amendment right of access to the Haitians on the existence of rights in the Haitians themselves. The majority reinterprets *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) and *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) to find such a predicate which the holdings of those cases do not require.

The district court found that Guantanamo Bay Naval Base is replete with civilians and civilian functions. The base as a whole, however, is surely a non-public forum. *See Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The Supreme Court stated the law governing First Amendment rights in non-public forums in *Perry Education Ass'n v. Perry Local Education Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983):

> In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech *is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.*

460 U.S. at 46, 103 S.Ct. at 955 (emphasis added). Later in the opinion, the Court stated:

> Implicit in the concept of the non-public forum is the right to make distinctions in access on the basis of subject matter and speaker identity.... The touchstone for evaluating these distinctions is *whether they are reasonable in light of the purpose which the forum at issue serves.*

460 U.S. at 49, 103 S.Ct. at 957 (emphasis added). Thus, even in a non-public forum, restrictions on speech must be reasonable and not motivated solely by the government's opposition to the speaker's point of view. While the government may decide that its interests in reserving the non-public forum for its intended purposes require the complete exclusion of certain speakers, such an exclusion must be "reasonable in light of the purpose which the forum at issue serves." *Perry*, 460 U.S. at 46, 49, 103 S.Ct. at 955, 957.

The record reveals that the government has indeed discriminated against HRC based upon the content of its speech. The district court found that the government has "opened the camps to members of the press and to representatives of the United Nations High Commission on Refugees." It has allowed access to the refugees to many individuals and groups. But, it has denied such access to the HRC lawyers who seek to assist the Haitians in understanding and navigating through the predicament in which our government placed them.

Applying the *Perry* standard to these facts, the district court did not err in holding that the government must allow HRC access to the Haitians at Guantanamo Bay, subject to appropriate time, place, and manner restrictions. First Amendment rights vary according to the specific characteristics of the forum. *Heffron v. Int'l Society for Krishna Consciousness*, 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981). Accordingly, such rights are broader in those parts of a military base used for nonmilitary functions than in areas utilized for purely military functions. *See Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972). The majority completely ignores the significance of the district court's finding that "the portions of the military installation to which HRC seeks access are not used for military purposes." The special master found that Guantanamo hums with civilian activity and is a "slice of America." Thus, the district court did not abuse its discretion in finding that the government's decision to exclude HRC from Guantanamo Bay was unreasonable in light of the "purpose which the forum at issue serves." *Perry*, 460 U.S. at 49, 103 S.Ct. at 957.

As the Supreme Court held in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), an American citizen's First Amendment rights may not constrain the government's power to exclude aliens from the United States. 408 U.S. at 768, 92 S.Ct. at 2584. In this case, however, HRC only asked for access to the Haitians, not their admission to the United States. I would uphold the district court's grant of a preliminary injunction temporarily staying repatriation of the Haitians under the general principle that federal courts may issue injunctions to preserve the status quo during litigation. *See, e.g., Hollon v. Mathis Independent School Dist.,* 491 F.2d 92, 93 (5th Cir.1974) (per curiam). While an appeal was pending in this case, the district court properly issued a limited preliminary injunction to ensure that HRC's First Amendment right was not circumvented by repatriation of the refugees pending expedited determination on the merits.

The majority is correct in holding that the government is not required to subsidize HRC's access to the Haitians. In order to allow HRC the access to which it is entitled under the First Amendment, however, the government may have to provide some assistance in this case that it would not be obligated to provide under more "normal" circumstances.[5] The district court must determine these factual matters. The majority's presumption that the government is "obligated" under the district court order "to provide HRC representatives with transportation to and from Guantanamo as well as shelter and other necessities while they are there," is completely unsupported by the record before this court. This appellate court may not make findings of fact, especially on matters not borne out by the record.

Finally, the majority opinion flouts a recognized canon of the legal profession. Lawyers must have access to their clients so they may advise them of potential rights and causes of action in American courts. Even if the clients have no such rights or causes of action, the lawyer is entitled to counsel the client regarding the legal situation and the available options. Instead, in this case, the majority holds that the Haitian refugees have no rights enforceable in American courts, and therefore they have no business meeting with lawyers. Thus, the majority deprives these non-English speaking Haitians, unschooled in the American legal system, of lawyers in a situation affecting their most fundamental interests, because of a prior determination that they have no rights to justify meeting with American lawyers. Obviously, such a determination of the Haitians' rights should be made only after they have received the benefit of counsel.

I would remand the case to the district court for it to make findings of fact regarding the scope of HRC's First Amendment right of access to the Haitians at Guantanamo Bay, to determine the appropriateness of time, place, and manner restrictions on that right, and to tailor the existing injunction to conform to its findings.

## II. JUDICIAL REVIEW UNDER THE APA

### A. BACKGROUND

After previously determining that the HRC would not prevail on the merits of an APA claim, the district court reconsidered the APA claim in light of this court's De-

---

5. None of the cases cited by the majority compel a different result. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) and *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) were both cases brought under the Due Process Clause and thus are not dispositive of the First Amendment claim asserted here. *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) is a case dealing with media access to government information and thus is also inapposite to the right asserted here. Finally, *Ukrainian American Bar Ass'n v. Baker,* 893 F.2d 1374, 1381 (D.C.Cir.1990) is inapplicable for two reasons. First, the plaintiffs in that case sought to require the government to provide information to excludable aliens. In this case, HRC seeks only a removal of the government's bar on HRC's ability to communicate with the Haitians. Second, *Ukrainian American Bar Ass'n* is not the law of this circuit, unlike *Jean v. Nelson,* a case which the majority has completely ignored.

cember 17, 1991 opinion and the briefs filed before this court. The district court, having the benefit of this court's opinion and a thorough briefing of the issue, recognized the significant distinction between "the President's discretion in establishing the program and subordinates' discretion or lack thereof in following program procedures and guidelines." The district court concluded that a court reviewing the actions of subordinates in carrying out the program would have meaningful standards against which to measure those actions. On appeal, the Eleventh Circuit majority reversed the district court on the basis of the district court's *previous* understanding of the APA issue which viewed the suit as challenging the broad grant of discretion to the President in establishing the interdiction program.

## B. DISCUSSION

The majority holds that the APA provides no basis for HRC's claims, because the presumption of reviewability normally afforded agency action withers in the light of national security or foreign affairs concerns. Additionally, the majority holds that neither the Executive Order nor the various international laws and statutory provisions upon which HRC relies provide any guidance regarding the procedures used in repatriation decisions. Because the APA provides for judicial scrutiny of the actions of low ranking government officials in order to determine if the officials are in compliance with Article 33 and the INS guidelines issued pursuant to Executive Order 12324, I would uphold the preliminary injunction on the APA claim.

Generally, the APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Both Article 33 and Executive Order No. 12324 with its implementing INS guidelines charge executive officials with the enforcement of United States immigration law. The law prohibits the return of political refugees to a country where they face persecution because of

their political views. The actions of lower level executive officials in the field are subject to judicial review under the APA in order to determine if the officials are complying with the law's mandate, unless the law itself precludes judicial review, or the actions of the executive officials have been committed to their discretion by law. *Compare* 5 U.S.C. § 706(2)(A) (providing the scope of judicial review) *with* 5 U.S.C. § 701(a) (providing exceptions to judicial review). HRC and the class of Haitians interdicted on the high seas can avail themselves of this judicial review if: (1) they satisfy the standard set out in 5 U.S.C. § 702, (2) the officials' actions are reviewable under 5 U.S.C. § 704 and (3) the officials' actions do not come under the exclusion provisions of 5 U.S.C. § 701(a)(1) and (2).

### 1. Refugees Satisfy Sections 702 and 704

First, a reviewing court must determine whether HRC and the class satisfy the standard of 5 U.S.C. § 702. Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The majority implies that the APA does not apply to aliens outside the borders of the United States because such aliens are not "persons" for purposes of APA review. Nowhere in the language of the statute does it state that a "person" must be a United States citizen. In fact, the statutory definition of "person," defined at 5 U.S.C. § 551(2), broadly defines the word as an "individual, partnership, corporation, association, or public or private organization other than an agency." Since the language of the APA does not specify that persons bringing suit under the Act must be United States citizens, HRC should not be precluded from raising an APA claim on that basis. *See also Stone v. Export–Import Bank*, 552 F.2d 132, 136 (5th Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (holding that foreign agency was a person); *Constructores Civiles De Centro*

*America, S.A. v. Hannah,* 459 F.2d 1183, 1190 (D.C.Cir.1972) (holding that APA review concerning a project in Nicaragua was available to a Honduran corporation); *Estrada v. Ahrens,* 296 F.2d 690 (5th Cir. 1961) (noting that the APA "does not say 'any citizen.' It does not say 'any person physically present in the United States.' ... [T]he emphasis is on the breadth of the coverage."). *O'Rourke v. United States Dept. of Justice,* 684 F.Supp. 716, 718 (D.D.C.1988) (holding that an Irish citizen imprisoned in his own country fell within the definition of "person" used in the APA); and *Neal–Cooper Grain Co. v. Kissinger,* 385 F.Supp. 769, 776 (D.D.C.1974) (holding that "person" included Mexican government).

Next, a reviewing court must determine whether HRC is "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The actions of low ranking government officials charged with the duty of properly interviewing the refugees constitute agency actions. *See* 5 U.S.C. § 701(b)(1); *see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The district court found that the refugees interdicted on the high seas have "well founded fears of political persecution if returned to Haiti." Specifically, the district court found that the refugees will suffer irreparable injury in the absence of an injunction because the procedures the agency followed in screening them were inadequate to properly identify political refugees. Under the Executive Order with its implementing guidelines, Haitians interdicted on the high seas are to be returned to Haiti, unless they are political refugees. Therefore, HRC and the interdicted Haitian class have been adversely affected by the agency's action of failing to follow agency rules setting forth adequate procedures to identify and protect Haitians who are political refugees.

Low ranking government officials have failed to take the steps necessary to ensure the enforcement of United States immigration laws as found in the Protocol and the Executive Order with its implementing INS guidelines. Thus, the Haitians interdicted on the high seas are "suffering legal wrong because of agency action." *See* 5 U.S.C. § 702. Both the Protocol and the Executive Order with its implementing INS guidelines constitute the relevant United States law relating to the interdiction of Haitians on the high seas. As I have previously concluded, the subject matter, legislative history, and subsequent construction of the Protocol support the proposition that it is self-executing and binding upon the United States in accordance with Article VI of the United States Constitution. *See Haitian Refugee Center, Inc. v. Baker,* 949 F.2d 1109, 1113–14 (11th Cir.1991) (Hatchett, J., dissenting). Additionally, the Protocol's protections apply to refugees outside the continental United States. Thus, Haitians interdicted on the high seas outside the continental United States are entitled to the Protocol's protections. *See Haitian Refugee Center, Inc. v. Baker,* 949 F.2d at 1115–16.

The Executive Order, which is based upon the authority vested in the President by the Constitution and statutes of the United States, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act (INA), as amended, 8 U.S.C. §§ 1182(f) and 1185(a)(1), is accorded the force and effect of a statute enacted by Congress. *See Farkas v. Texas Instruments,* 375 F.2d 629, 632 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); *see also Legal Aid Society of Alameda City v. Brennan,* 608 F.2d 1319, 1329–30 n. 14 (9th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). Since the low ranking government officials' actions violate these laws, the Haitians interdicted on the high seas are aggrieved by agency action within the meaning of relevant law. *See* 5 U.S.C. § 702. Thus, HRC and the refugees satisfy the requirements of 5 U.S.C. § 702.

Nevertheless, in order to be reviewable, the decision to repatriate must constitute "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The refugees were forceful-

ly repatriated despite inadequate screening procedures used by low ranking government officials. Therefore, INS took final action, and the Haitians had no other adequate remedy to compel INS officials to comply with the mandates of United States law. Thus, this agency action is subject to judicial review unless the relevant law precludes judicial review, or the action of the agency is committed to its discretion by law. *See* 5 U.S.C. § 701(a)(1) and (2).

### 2. Reviewability and Section 701(a)(1) Exceptions

Once the refugees established that they met the criteria set out in APA sections 702 and 704, a strong presumption of reviewability of agency action attached. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). In *Bowen*, the Court noted:

> Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

*Bowen*, 476 U.S. at 671, 106 S.Ct. at 2136 (citing S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). In the present case, the government is in effect asking for a "blank check" drawn to the credit of the INS because the Haitian refugees have not reached the shores of the United States.

The actions of low ranking government officials charged with the duty of properly interviewing the refugees are subject to judicial review unless it is clear that such review is barred. *See Morris v. Gressette*, 432 U.S. 491, 500–01, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Barlow v. Collins*, 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Nothing in the Protocol or Executive Order 12324 with its implementing INS guidelines precludes

judicial review. As noted earlier, I concluded in *Haitian Refugee Center v. Baker*, 949 F.2d at 1113–16 that the Protocol incorporating Article 33 is self-executing and applies extraterritorially. Article 33 provides:

> No contracting state shall expel or return (refouler) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion.

Convention Relating to the Status of Refugees, art. 33, ¶ 1, 198 U.N.T.S. 150, 176 (July 28, 1951). The Protocol defines "refugee" as any person who,

> owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group, or political opinion, outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

Protocol, art. 1, ¶ 2, 19 U.S.T. 6223, 6225; T.I.A.S. No. 6577 at 3. Nothing in the language of Article 33 or definitional sections of the Protocol precludes judicial review of the enforcement of the law's mandate.

Additionally, a district court does have jurisdiction to evaluate claims based on an executive order. *See Farkas*, 375 F.2d at 632. The Executive Order on which the refugees rely states:

> [N]o person who is a refugee will be returned without his consent.... The Attorney General shall, in consultation with the Secretary of State and the Secretary of the Department in which the Coast Guard is operating, take whatever steps are necessary to ensure the fair enforcement of our laws relating to immigration (including effective implementation of this Executive Order) and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland.

Exec.Order No. 12324, 46 Fed.Reg. 48,109 (1981). Nevertheless, the majority rejects the refugees' claim based on the Executive

Order, stating that the Executive Order does not give rise to a private cause of action. Apparently, the majority believes that since the Executive Order establishes an interdiction program that takes place on the high seas, "it could not have been the intention of the President to allow the interdictees to initiate judicial review of *their cases* in the district courts of the United States." Majority Op. at 1511 (emphasis added). At this point the majority's position must fail.

The refugees do not seek judicial review of the denial of asylum in their individual cases. The majority took note of this fact when it recognized "[HRC's] claim ... is not based on a challenge to any individual determination made by the INS officers. Rather, the plaintiffs challenge the procedure used to interview the interdictees in order to determine which ones are subject to being repatriated." Majority Op. at 1508. The refugees' assertion that low level executive officials are not following guidelines for the interviewing procedures enables them to pursue this cause of action.

This case is analogous to *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (en banc), *aff'd* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). In *Jean,* we held that although courts have no authority to evaluate individual deportation orders, courts do have the authority to determine whether the actions of lower-level immigration officials were exercised in accordance with executive policy. We stated:

> [S]ince the discretion of lower-level immigration officials is circumscribed not only by legislative enactments but also by the instructions of their superiors in the executive branch, ... [t]he district court must still determine whether the actions of lower-level officials in the field conform to the policy statements of their superiors in Washington.

*Jean,* 727 F.2d at 978. In this case, the refugees do not seek review of individual asylum determinations, but rather seek review of the procedures the lower-level officials employed. The refugees claim that these lower-level officials did not follow the guidelines promulgated pursuant to the Executive Order in processing them. They also allege that the officials acted arbitrarily and capriciously. Although the aliens in *Jean* were on United States soil and the Haitians in this case were not, nothing in the language of the APA suggests that aliens cannot seek redress under the APA. Further, nothing in the language of the Protocol or the Executive Order precludes the refugees from asserting a cause of action based on the APA to set aside the acts of low ranking government officials.

The Supreme Court, however, has held that section 701(a)(1) of the APA can still apply to preclude judicial review even if the specific language of the law does not preclude such review. In *Bowen,* the Supreme Court stated that the presumption against reviewability can be overcome by "specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is 'fairly discernible' in the detail of the legislative scheme." *Bowen,* 476 U.S. at 673, 106 S.Ct. at 2137 (quoting *Block v. Community Nutrition Institute,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984)). The *Bowen* Court also recognized that

> the congressional intent necessary to overcome the presumption may also be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it ... or from the collective import of legislative and judicial history behind a particular statute, ... [or] by inferences of intent drawn from the statutory scheme as a whole.

*Bowen,* 476 U.S. at 673 n. 4, 106 S.Ct. at 2137 n. 4 (citations omitted). In this case, Presidential or Congressional intent to bar judicial review of the actions of low level government officials charged with the duty of properly interviewing refugees is not "fairly discernable" in laws relating to the interdiction of Haitians. The legislative history surrounding the United States' accession to the Protocol does not indicate that Congress intended to bar judicial review of the enforcement of this law. Congress intended that the Protocol be self-

executing and apply extraterritorially. *See Haitian Refugee Center v. Baker*, 949 F.2d 1109, 1113–14 (11th Cir.1991) (Hatchett, J., dissenting). *See also* Note, *Interdiction: The United States Continuing Violation of International Law*, 68 B.U.L.Rev. 773 (1988). Neither specific language nor reliable indicators rebut the presumption of reviewability. After examining as a whole the scheme of the United States's laws relating to the interdiction of Haitians on the high seas, I conclude that United States immigration law concerning interdiction does not preclude judicial review in this setting. Thus, section 701(a)(1) of the APA is inapplicable.

Additionally, the President specifically provided in his Executive Order that the United States's immigration laws would be enforced outside the territorial boundaries and waters of the United States. This exportation of laws also constitutes an exportation of rights and duties. These rights and duties are detailed in the Protocol and the Executive Order. Since the government has a duty to enforce these rights outside the borders of the United States, the corresponding enforcement mechanisms must accompany these rights. Thus, I cannot conclude that the President did not intend for the remedy provided by the APA to accompany the exportation and enforcement of United States immigration laws. This court must not adopt the unconscionable position of divorcing the remedy of APA review from the right to such review created by the Protocol and the Executive Order.

3. Reviewability and the Section 701(a)(2) Exception

The majority states that the refugees have no right to judicial review of the government's compliance with the INA through the APA. Specifically, the majority points to the language of the INA to determine that the interdicted Haitians have no cognizable rights. However, it is on the refugees' right to judicial review, through the APA, testing the government's compliance with the Protocol and the Executive Order upon which I find that the refugees have demonstrated a likelihood of success. Thus, the court must determine whether meaningful guidelines exist that provide a method to evaluate the actions of the lower-level INS officials. *See Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (the APA is applicable in "instances where statutes are "drawn so that a court would have [a] meaningful standard against which to judge the agency's exercise of discretion"). In the language of the APA, the inquiry is whether the officials' actions were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). I find that they are not.

The majority concedes that " '[e]ven when a decision is committed to agency discretion, a court may consider allegations that an agency failed to follow its own binding regulations.' " Majority Op. at 1508 (quoting *State of Florida, Dept. of Business Regulation v. United States Dept. of the Interior*, 768 F.2d 1248, 1257 n. 11 (11th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986)). Further, in *CC Distributors, Inc. v. United States*, 883 F.2d 146, 154 (D.C.Cir.1989), the court held that administrative regulations promulgated to execute an agency's legal directives may serve as standards for judicial review. *See also Center for Auto Safety v. Dole*, 846 F.2d 1532 (D.C.Cir. 1988). The majority, however, finds that the language of the Protocol and the Executive Order neither limits lower-level INS agents' discretion nor enumerates specific criteria to be weighed when deciding who is a "refugee." [6]

What the majority fails to recognize is that the INS Guidelines serve as the standard for judicial review for both the Protocol and the Executive Order. The INS guidelines state that the "authority" upon which the guidelines are based includes "Article 33, United Nations Convention and Protocol Relating to the Status of Refugees" and "Executive Order No. 12324 dat-

---

**6.** In this instance, "refugee" is used as a legal term of art indicating interdictees who have undergone the appropriate screening proce-

dures set forth in the INS guidelines. On other occasions, I have used the term "refugee" in its broad and non-legal sense.

ed September 29, 1981 (interdiction of Illegal Aliens)." The INS Guidelines for Interdiction at Sea were promulgated as a direct result of the Protocol and the Executive Order. The majority noted, "The Executive Order was issued specifically to establish a procedure for interdiction of Haitian migrants on the high seas." Majority Op. at 1510. The majority, however, found that the INS Guidelines did not provide meaningful standards for judicial review. Thus, the majority held that lower-level INS officials' actions were committed to agency discretion by law. This conclusion is erroneous. In part, the INS guidelines state:

### INS OFFICER RESPONSIBILITIES

A.  To the extent that it is, within the opinion of the Commanding Officer of the United States Coast Guard vessel, safe and practicable, each person aboard an interdicted vessel shall be spoken to by an INS officer, through an interpreter. A log record shall be maintained of each such person, based on their responses to the following inquiries:

1.  Name;
2.  Date of Birth;
3.  Nationality;
4.  Home Town (obtain sufficient information to enable a later location of the individual to check on possible persecution);
5.  All Documents or Evidence Presented;
6.  Why did you leave Haiti;
7.  Why do you wish to go to the United States;
8.  Is there any reason why you cannot return to Haiti?

B.  A copy of the log prepared by the INS officers shall be provided to the Commanding Officer of the Coast Guard vessel.

C.  INS officers shall be constantly watchful for any indication (including bare claims) that a person or persons on board the interdicted vessel may qualify as refugees under the United Nations Convention and Protocol.

D.  If there is any indication of possible qualification for refugee status by a person or persons on board an interdicted vessel, INS officers shall conduct individual interviews regarding such possible qualification.

E.  Interviews regarding possible refugee status shall be conducted out of the hearing of other persons.

F.  If necessary, INS officers will consult with Department of State officials, either on board, or via radio communications.

G.  Individual records shall be made of all interviews regarding possible qualification for refugee status.

H.  If the interview suggests that a legitimate claim to refugee status exists, the person involved shall be removed from the interdicted vessel, and his or her passage to the United States shall be arranged.

I.  Individual record folders shall be prepared and maintained by INS officers in every case where a person is being sent on to the United States, and such record folder may be used to support such person's claim in the United States. (The individual folder shall contain a sworn statement by the applicants concerning the claim).

The guidelines specifically detail information that INS officials are to obtain from each Haitian claiming refugee status. The guidelines do not use permissive language to describe how INS officials are to treat Haitians who make even bare claims that they qualify as refugees under the Protocol. Instead, the guidelines employ mandatory language such as "INS officers *shall* conduct individual interviews"; "Interviews ... *will* be conducted out of the hearing of other persons"; "Individual records *shall* be made"; "If the interview suggests that a legitimate claim to refugee status exists, the person involved *shall be removed* from the interdicted vessel, and his or her passage to the United States *shall* be arranged." INS Guidelines §§ C, D, E, G, and H. These guidelines state standards that are to be adhered to when processing interdicted Haitians. The government's failure to follow these guidelines, as found by the district court, means

that the refugees have demonstrated a substantial likelihood of success on the APA claim.

### C. CONCLUSION

HRC and the class of Haitians interdicted on the high seas can avail themselves of judicial review because: (1) they satisfy the standard set out in 5 U.S.C. § 702; (2) the government officials' actions are reviewable under 5 U.S.C. § 704; and (3) the government officials' actions do not come under the exclusion provisions of 5 U.S.C. § 701(a). Thus, the APA provides HRC with a cause of action to seek judicial review of the actions of low ranking government officials charged with the duty of properly screening Haitian interdictees.